## GUTHRIE v. CURLETT et al.

(Circuit Court of Appeals, Second Circuit. February 1, 1926.)

No. 190.

**1. Patents ⬤⟞16.**

Patentee, to merit patent, must disclose new and useful art, machine, manufacture, or composition of matter.

**2. Patents ⬤⟞328.**

Guthrie patent, No. 1,041,623, claims 1, 3, for consolidated railroad tariff index, *held* invalid, for lack of patentable subject-matter.

Appeal from the District Court of the United States for the Southern District of New York.

Suit for infringement of patent by Charles B. Guthrie against W. S. Curlett, agent for the Atlantic City Railroad Company, and others. Decree for defendants, plaintiff appeals, and defendants cross-appeal. Affirmed.

Suit is upon patent No. 1,041,623, issued to the plaintiff October 15, 1912, for a "consolidated tariff index." In his specification plaintiff points out that every railroad in this country is required to publish an individual tariff index, to enable its own agents as well as the public to determine what tariffs are in effect and are applicable to shipments in a given territory. Considering the great number of railways in the United States, the cost of issuing indices is plainly enormous.

The object of the invention is stated to be the provision of "a joint or consolidated tariff index that will show all of the tariffs in force on a number of railroads," which index is to be "issued by an agent acting under power of attorney from the various railroads or carriers, and thus overcoming the necessity of each railroad publishing an individual tariff index."

In practice, Guthrie says he prefers to publish one index for one section of the United States, covering the whole country with (as he suggests) three indices. This, however, is only for convenience in handling; there might be one index for the whole country.

It is, however, plain from the specification that the *consolidated* feature of plaintiff's index is the important one; for if, for instance, all transcontinental lines appointed the same agent, that agent, if a new tariff or schedule were filed with the Interstate Commerce Commission, would not "go to the expense of preparing and issuing a supplement, or reissuing the entire tariff index, as is now the general practice." Whenever, under Guthrie's system, a "railroad makes a change in any of its tariffs, it merely has to file a schedule showing such change with the Interstate Commerce Commission as at present, as the agent who issues the consolidated tariff index will maintain an office in Washington." Therefore, when a railroad makes a change, it will notify its agent, who will change his consolidated publication only, and thus save a great deal of printing.

Premising the foregoing description of intention, the specification sets forth the means whereby the intent is to be carried out.

Let it be assumed that the essential parts of the tariff are the participating carriers, the terminals of the routes, and the commodities transported. Guthrie devises symbols for all these essentials of information and others. Thus a given railroad is known as A 1; canned goods become C, etc. Thus there is constructed a volume which, by a liberal use of symbols, will explain to the initiated what are the participating carriers, the tariff from any point in the section covered to any other point in the same section, what tariffs apply to various kinds of goods, and who and where are the officers of the various specified railways issuing the tariffs. The result is, as the specification puts it, that any tariff referred to in this index is by means of the abbreviations "completely described as far as it is practicable in a directory."

The claims in suit are 1 and 3; of these No. 3 quite particularly and fully describes Guthrie's concept. It is as follows:

"A consolidated tariff index comprising groups of leaves, the leaves of some of said groups being provided with means that

show the tariffs that are issued by a number of transportation companies, a key composed of symbols grouped with said means for showing the originating carriers and participating carriers that participate in said various tariffs, and means on the leaves of another group for explaining said key or defining what each symbol of the key designates; the symbols that designate the originating carriers being distinguished from the symbols that designate the participating carriers in some suitable manner."

The defendant is an agent for some 57 railroads. For them he publishes an index which the court below found would be an infringement of Guthrie's patent, if the patent were valid. The bill, however, was dismissed on the ground of anticipation by one Burford, whereupon plaintiff appealed.

David P. Wolhaupter, of Washington, D. C., and Robert B. Killgore, of New York City, for appellant.

Robert J. Fisher, of Washington, D. C., and R. W. Barrett, of New York City, for appellees.

Before ROGERS, HOUGH, and MACK, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). While not disagreeing with the court below in its estimate of Burford's earlier achievement, we shall affirm the result because of lack of patentable subject matter.

[1, 2] A patentee, to merit a patent, must disclose a new and useful art, machine, manufacture, or composition of matter. Plainly there is before us neither a machine nor a composition of matter; the latter, if for no other reason than that no claim is made therefor. Underwood v. Gerber, 149 U. S. 224, 13 S. Ct. 854, 37 L. Ed. 710.

Consequently this patent is for either a manufacture or an art, and plaintiff asserts that he has produced a manufacture— a word which he wishes used to mean anything made by the hand of man, which is neither of the other things enumerated by the statute. International, etc., Co. v. Sievert, 213 F. 225, 129 C. C. A. 569.

But this effort at definition requires the court first to inquire whether the subject-matter of the patent is any other of the statutory list, for, if so, it must be assigned to that category and not to the catch-all of "manufactures." This inquiry is one of fact, concerning which opinions may differ; but, after rather prolonged consideration of this patent, we believe that it discloses an art, which, if it be novel, is not the kind of art protected by the patent acts.

What Guthrie shows is how to compress into small space a lot of information about freight tariffs; he is really giving advice as to how to make indices, as one might advise concerning dictionaries or directories; and the patentee substantially calls his work by the latter name, when (ut supra) he lauds it as completely describing a given tariff "as far as is practicable in a *directory*."

A new method, art, or process of making directories, dictionaries, encyclopædias, or other compendious statements of written information, may be both new and useful; but the patent law is prosaically practical, it can never get away from the necessity of means, and unless patentable means of expressing or using the new idea are shown there can be no valid patent.

The nonpatentability of a system—i. e., a connected view of the principles of some department of knowledge or action—has been sufficiently shown in Hotel Security Checking Co. v. Lorraine, 160 F. 467, 87 C. C. A. 451, 24 L. R. A. (N. S.) 665; Berardini v. Tocci (D. C.) 190 F. 329, affirmed 200 F. 1021, 118 C. C. A. 659, and the earlier cases there fully cited.

Undoubtedly one may invent (i. e., come upon or discover) a system, and by very crude means, aided by the doctrine of equivalents, practically appropriate the business begotten by the system for the statutory term; of this the early telephone patents are the classic example. But what gives the breath of life to such a patent is not the system or the good advice contained in the disclosure, but the means shown and described. Indices are a good example of this truth; the first "card index" was plainly patentable, not because it was perhaps an excellent index, but because the *means* of making possibly a very poor index were novel. Vide Library Bureau v. Macey, 148 F. 380, 78 C. C. A. 194.

In this case, however, no *means* are suggested for making a *consolidated* index, except the employment of symbols. There was a time, say that of Cadmus, when the alphabet was patentable; but we decline to see anything now patentable in suggesting that a railway be called A or canned goods C.

The patentee may and does *call* what he produces a manufacture, to wit, a book of so many leaves and a given amount of print thereon; but the question is not what an interested party calls it, but what *is* it, and we consider the only possibly novel part of it, what might be called the *plot* of the work—

i. e., the story revealed, and that can be copyrighted, but not patented.

Whether a thing is a manufacture or not is sometimes a close question, of which Cincinnati Traction Co. v. Pope, 210 F. 443, 127 C. C. A. 175 is an excellent instance. There a "time limit transfer ticket" was held patentable, because it was "not a method at all, but a physical tangible facility." Such a ticket is a form, made once and used any time; it may truthfully be called a physical facility, as much so the punch that cancels it. But no such summary description is possible of this index. It is never finished, until the railway business itself ends; what is made to-day may be useless in a month or so, not because of new inventions, but because the method of doing business may change. The only thing constant about this index is the method or art of compiling it; i. e., advice as to how to compile, which is not patentable.

Thus as a question of fact we consider this patent as disclosing merely advice as to how to make an index, and the means (if any) disclosed for doing it as not patentably novel.

The decree is affirmed, with costs.